et al. Mr. McGrath, whenever you're ready. Good morning, Your Honors. May it please the Court, my name is Brian McGrath. And with my co-counsel Libby Sobik, we represent three minor plaintiffs and their parents. Our claim is under the Americans with Disabilities Act, the ADA, and Section 504 of the Rehabilitation Act. And it's that sections of the Wisconsin Open Enrollment Law discriminate against students with disabilities. The Wisconsin Open Enrollment Program is a program that allows students who live in one school district, if they're unsatisfied with the schools in that district for any reason, to apply to another school district that has excess capacity. The problem with the Open Enrollment Program and the Open Enrollment Law is that it treats students with disabilities differently than students who don't have disabilities. It places additional obstacles in the way of students with disabilities to prevent their full participation in the program. Actually, that's not how the statute works. It's even-handed. Everybody has to comply with the same eligibility requirements. In other words, there has to be capacity in the receiving district in the educational programming that the student requires, whether it's grade-level programming or special education programming. There must be existing excess capacity in the non-resident district, so every applicant is treated the same and subjected to the same eligibility criteria. With respect, Your Honor, I disagree with that. There are four criteria for a non-resident district to reject the application of an open enrollment applicant. And they're all based on the existing capacity in the receiving district to serve the educational needs of the student. The ADA and the Rehabilitation Act do not require disability-blind admissions. Well, that's the question of law in this case, Your Honor. And that's a statement of the law. There are no cases that require that. I respectfully disagree with Your Honor for two reasons, at least. One is that, well, I believe Your Honor is correct that under 5A1 of the statute, it treats all students the same. But under 5A4 of the statute, it allows school districts to reject applications from students with disabilities and only students with disabilities. Section 5A4... Based on capacity. So it's the same. It's just a statement of the same eligibility criteria. So Your Honor... It's all based on existing excess capacity in the receiving district to serve the educational needs of the student applicant. The argument that Your Honor is making and that the state makes is that there is such a thing under federal law as a regular education seat, that there is a seat in a public school in the state of Wisconsin that no child with a disability can fill. And if that argument is correct, if federal law acknowledges that there are seats in Wisconsin public schools that no child with a disability, no matter what the disability, can fill, then Your Honor would be right and the defendants would be right. My point is that this is not a true open enrollment program. It's a limited open enrollment program based on existing excess capacity in non-resident districts. It does not change the default in Wisconsin that every student has a state constitutional right to attend school in his or her own resident district. It adds to that this very limited ability to apply to transfer to a non-resident district if the receiving district has existing capacity to serve that student's educational needs. So for example, if the non-resident district for a particular school year had existing capacity in the second grade but didn't have existing capacity in the fourth grade and a fourth grader applied and was rejected because there was no existing capacity, we wouldn't say that the fourth grader is being discriminated against. So too, if a receiving district, a non-resident district, has capacity in third grade regular education but no capacity in third grade special education, we wouldn't say that the special ed student applicant who was rejected because there was no capacity was being discriminated against. There's an even-handed criteria and it's all based on existing capacity. Again, I respectfully disagree because there's an assumption in your Honor's question that I believe is false under the ADA and that is that there is such a thing as a third grade regular education seat that no child with a disability can fill. There is such a thing under the ADA and the Rehabilitation Act. Existing programs don't have to be altered. Well, Your Honor, so first of all, there's no such exception in the text of the ADA or Section 504. The regulation, the Code of Federal Regulation that I believe Your Honor is relying upon is... It's the duty to accommodate, right? If there's discrimination going on in the first instance and a plaintiff can prove the prima facie case of discrimination or discriminatory exclusion, then we get to the question of accommodation and whether a proposed accommodation is going to force a fundamental alteration of the program in question. Right. But, you know, we're not there yet. We don't even have a case of discrimination going on here because properly understood, this program applies an even-handed criteria for admission, which is to say there must be existing programmatic capacity in the non-resident school district to meet the applicant's needs, whether it's a need for sixth grade programming or it's a need for special ed programming. Counsel, let me ask you a question that I think might get at the same point that Judge Sykes is making. And this is... I've struggled to try to figure out what the definition of special education is under Wisconsin law. Is it a seat in, say, a special life skills classroom? Right? In that sense, we might be talking about a seat in a third grade classroom analogously to a special ed classroom where the kids might spend some of the day being mainstreamed but there is actually a seat that they fill in a particular classroom. Or does special education also encompass the third grader who may indeed be gifted and exceed academic requirements for, say, the third grade, but needs speech therapy services and so thus has an IEP because he goes to speech therapy services three times a week? Does special education encompass both of those students? So it does and far more. It also includes a student who can sit in the third grade regular education classroom as the defendants characterize it. But because she has a hearing impairment or sight impairment, has to sit in front and maybe get some extra materials to understand, extra reading materials if it's a sight disability or maybe have somebody help her take a test. And that student, who otherwise just sits in a regular third grade classroom, can be barred from the open enrollment program simply because she has a disability. Okay, but this is a question then that I don't quite understand then how the program works. Because if the school board makes an ex ante determination in January, the way the statute is written is it seems to be talking about seats or space, kind of in the life skills example that I gave where you have a special special ed classroom and then your regular third grade classroom. But in the example that you're talking about where maybe there's hearing or visual impairment or the example I gave about speech therapy, you're not talking about seats. You're talking about maybe hours available that the speech therapist at the school has to accommodate maybe three more sessions a week. Or you're talking about could we move a seat up to the front, which would be something easy. And that requires the case by case ex post determination that the district court found here saved the program. Because as applied to any individual student, then the student would not be discriminated against based on the disability but on the inability of the school district to meet that need. So what is this January determination? Is it about seats or is it about, hey, our speech therapist normally has three hours a week that's not being used right now? So based upon this record, Your Honor, it's only about seats. The statute says in January before any child has applied, because children can't apply until after the first Monday in February, so without any knowledge of who the applicants are or what disabilities they have, the school says I have X regular education seats in which no child with a disability, no matter what the disability may set, and I have Y special education seats, whatever the district thinks that means, and that decision-making process in January discriminates against children with disabilities and it cannot be changed under Wisconsin law. The district can't say, okay, now that we have the applications in February and we see that Brian McGrath is an applicant and all he has is the sight disability or the vision disability or the speech disability where he could sit in a regular education classroom as we call it, we'll accept him. Under the regulations adopted by DPI in implementing this program, they can't go back and change that January decision, so when the decision is made by January, in January, for example, like it was by Moschigo, Norway in this case, they said we have 50-some regular education seats, but no child with a disability, no matter what the disability, may sit in any of those seats, and once they make that decision, it has three impacts. First is, you can only apply to three school districts under the Open Enrollment Program, so if you have a disability, you would be discouraged from applying to Moschigo, Norway because they've said in the beginning, we will not take any child with a disability. That itself is a violation. Second, as I said, they can't take that decision back. It's barred forever. Why can't they take it back? There's a Wisconsin Administrative Code provision, we cited in our brief, 36.06 sub 5 sub D, that says once you've made the January decision, you can't change it unless a circumstance occurs as follows. We believe that we have 40 seats in third grade. We expect to have 28 continuing students, so we have two openings. If one of those 28 continuing students moves, leaves for whatever reason, and now you only have 27 continuing students, you can say that there's a third seat. But other than a change like that, under the Wisconsin Administrative Code, implementing the Open Enrollment Program, you can't go back and revisit on a case-by-case basis. Is this really how the statute is working in practice? I mean, are they really? I guess there is some ambiguity in the way the January determination language works, and then how it seems to be applied based on the later provision of the statute that envisions more as applied, looking at the circumstances of each case approach. But is it really being applied in such a way that a child who needed solely extra time on tests and an IEP for that basis is being barred? Well, let's take SB, one of our plaintiffs, as an example. SB applied for a third grade seat in Sherwood. But SB needed more than extra time on tests. Well, SB had ADHD, okay? His IEP is in the record. You can see what it requires. But at the time, his mother had been unsatisfied with the services that Milwaukee Public Schools was giving her son, and she had rejected the services that he was getting at MPS. So at the time he applied to Sherwood, he was getting no special education services. And when he was at Sherwood, because he was admitted until he was expelled in October, he received no special education services. But when Sherwood found out he had an IEP, he had a disability, they kicked him out. So there's a clear example where there's no indication that Sherwood would have had any problems educating SB. They were educating him for about a month. They kicked him out under 5A4, which is the section of the Open Enrollment Program that allows them to discriminate against children with disabilities. So that's a great example. In Muskego, Norway, a defendant here is another. They said that there are 50 seats in Muskego, Norway that any child in the state of Wisconsin can apply to sit in, except every child with a disability. We will not accept their application. And that, Judge Sykes, is why I think that the assumption that you were making in your question we disagree with, because when it sets that decision in January, it believes that there are two different things under federal law, a regular education seat in which no child with a disability may sit, and a special education seat. But that's not what the ADA says. Your argument might be valid if this were a true open enrollment, if the statute actually said that any child can take his state constitutional right to a sound basic education and transport it across district lines and attend any district that his parents choose. That's not what this program says. It's not school choice. What it is is a very limited allocation of excess capacity to non-resident students. But the problem with it, you're... And it doesn't discriminate based on disability, because federal law doesn't describe disability discrimination in the way that you're describing it. Federal law says that it's permissible to take disability into account. And our cases say that, that disability is not thrown out for determining essential eligibility under the ADA or the Rehabilitation Act. And so the district is entitled to consider what the educational needs of the student are. And if those include special ed, and there's an even-handed capacity determination that's made, as Judge Barrett said, ex ante, there's no discrimination going on here. I disagree with you for several reasons. First is, I disagree that that's what the ADA says. What the ADA says is that students with disabilities, people with disabilities, must be allowed to participate in all government programs, and there's no dispute that the open enrollment... On the terms of those programs. You're asking for an alteration in the terms of these programs. You're asking for a seat in regular ed for a special ed student. And federal law does not require that. It doesn't mandate that. That's the second reason I disagree with you, Your Honor, because what you're saying is that a qualification to participate in open enrollment is that you not be disabled. No, that's not a qualification. Disabled students are routinely accepted under open enrollment if the receiving district has capacity. And as a matter of fact, a majority of the time, disabled students with IEPs are accepted in non-resident districts. They're rejected only when there is no capacity. In this case, Muskego, Norway had sixth grade seats. That's the seat that... It's a capacity determination, and capacity is neutral. No, but the capacity determination that Your Honor is arguing for is one that distinguishes, I would say discriminates, between children with and without disabilities. It doesn't discriminate. It does distinguish, and there's a difference between those two terms legally. The state is entitled to distinguish between students with different needs, including students who are disabled and have a need for special education services. But the state is not allowed to distinguish, again, I would say discriminate, to prohibit children with disabilities to participate in a government program, open enrollment, precisely the way that children without disabilities participate. They are permitted to. If there is existing capacity in special ed, then the receiving district will admit them. Your Honor, the other way I've tried to explain our position to others who I've talked to about it is to, and I've said this from the beginning of the case, there are two doors by which you can enter a public school district, and the first door that you enter it in Wisconsin is through residence, and so resident students apply to enter a public school district. Everybody in this courtroom agrees that you cannot distinguish between students with disabilities and students without disabilities as they enter that door. You can't say, I don't have a space for you. You can't say, well, our schools only have resident, only have regular education seats. The door can't be blocked or barred. That's because of IDEA, right? That's because of the, right. Also the ADA and Section 504 say the same thing. But because there's a broader obligation on the resident district to give a free public education to everyone, including disabled students. So the one door thing comes from a different obligation. I disagree, Your Honor. If you did not have the IDEA, before you had the IDEA, you still could not bar that door to students or block that door to students with disabilities. The ADA and Section 504 would expressly preclude that. So the other door is through open enrollment. Child who tries to enter through that door, the defendants assert, can be barred or blocked because she has a disability. I mean, there's no doubt, right, that these three plaintiffs were not allowed to participate in open enrollment because they're disabled. Now, Your Honor. I thought it was because there was no capacity. Are you challenging whether these districts had capacity? Because I thought there was no capacity. They didn't have the programs and they didn't have the space. Well, so let's again look at these three students. There was capacity for SB because he was sitting in a seat when he got expelled. There was capacity for RW because he was accepted and his identical twin brother was accepted into kindergarten until they found out that RW was disabled and then they revoked it. And there were, I can't remember if it was six or eight seats in sixth grade for PF. And he was excluded. So the point of those decisions is that those six seats in Muskego, Norway, could only be filled by children without disabilities. Well, think about the Shorewood one, right? That was when SB's admission was revoked after it was discovered that he had an IEP. You cannot have an IEP and enroll, and this would be true for a kindergartner whose special ed needs were discovered upon enrollment. The child may not have one, but if the child is autistic, say, or if the child has severe ADHD, the child might still require more resources than the other regular or typical sixth grader because the teacher can't handle the needs, right, the behavior or the extra learning assistance that's needed, even if the parents haven't pursued an IEP. So it could be, right, that Shorewood revokes its admission of SB not because it says, oh, you're disabled, we don't want you, because it says regardless of whether you had an IEP in place, we can't handle you because of what other behaviors or needs you have in the classroom. We just don't have the resources. So there's no evidence in the record that that was the decision that was made. I would like to save some time for rebuttal, so I'd like to make one last point and then save the rest of the time for rebuttal. And my last point is to be clear upon what we're arguing. We're arguing that under the Open Enrollment Program, students without disabilities should be admitted in the same way as students without disabilities. Then the school district under the ADA would offer them a reasonable accommodation for their disability, and then the parents would accept it or not. But if the accommodation resulted in a fundamental alteration of the program, then they would not have to provide that accommodation to the students. So admit, offer a reasonable accommodation, and then do the fundamental alteration. That works a fundamental alteration of the program writ large. You're asking for a rewrite of state law. I'm asking the state law not discriminate against children with disabilities. And with the court's permission, I would save the remainder of my time for rebuttal. Thank you. Mr. Rusmano. May it please the court. My name is Anthony Rusmano. I represent the state defendants, the Department of Public Instruction, and the state superintendent. And we're involved in this lawsuit on the level, I think, most of the conversation so far has been about the law on its face, whether the law itself, as written, violates the ADA's nondiscrimination provision. And it sounds to me like the court already understands the main thrust of the law, that it is indeed capacity-based. It must be based on, in the first instance, the school determines how much space will be available in various programs or services in January. Then there's an application period, at the end of which the schools look at the applications and see if, student by student, if that student's particular space and capacity needs are available in that district. So can you answer my question about seats versus services? Is the determination just about seats, or is it, say, our speech therapist only has three additional hours per week? So the student who is otherwise typical but needs some speech therapy services pursuant to an IEP, in the case-by-case determination later, may not qualify just because the speech therapy services aren't available. That's not a seat determination, right? That's a services one. Is that determination made in January? Yes, it's services. So seats is sort of a rough way of talking about it, but in reality, sometimes these students who need special education, and that's the key to special education staffing, that staff might come into a regular education classroom for an hour and work with that student. Or that student might leave that classroom and go to a different room with that same teacher. But the room isn't really the thing. It's the availability of the staffing to provide that service. In most instances, there will be students who can't stay in the regular education program for certainly, and have to spend all day, or three hours a day, or two hours a day in a different classroom altogether. So the determination schools make has to be, what are the services we provide? What is our staffing? And how much extra give is there right now in that? Same thing they do in their year-by-year classes, but this is a little more complicated because  But you couldn't, because of the way all of this works, you can't really say we can take five special ed students, or five students with IEPs, because their needs might differ so dramatically. I mean, if all of your applicants who had IEPs just needed, say, speech therapy, but otherwise needed no other services, you might be able to take 10, right? That's right, Your Honor. So you can't really say, I mean, it's not, the plaintiffs below have been saying there's a pool where you have maybe five special ed seats, as I understand it, but maybe 30 regular seats. But you're saying that's not how it works? That's not. Because you can't cap it, because you can't know exactly how many students you could accommodate, because it depends on, is it extra time on tests, et cetera? That's exactly right, Your Honor. The determination under the law, if you're complying with the law, if you're a school district doing it right, your January determination, you're supposed to figure out what in particular do you have? Who are your staff members? What do they do? And how much extra time do they have? But say it's speech therapy. Does that teacher have half a day open, an hour open, whatever? And then the reason that's done beforehand is because the idea is you're not supposed to be playing favorites. You're supposed to see, how much room do we have? And then you take in applications. And you have to look at them based on what you already decided you have. And then you look at the application. And you must look at what that application says that student needs in particular. So if a student needs half an hour of speech therapy, and you have space half an hour or more, then you must take that student. It has to be based on that particular student's capacity needs or service needs. What information does a parent get after the January determination? Is there a listing or something that the parents can look at when they make a decision whether to apply under enrollment to another district? It might vary by district, Your Honor. I'm not certain. I believe these are, to a certain extent, they're public. There's going to be, it has to be done at a school board meeting. So that's going to be public. All the numbers, the additions, subtractions, multiplications, I don't know if that's in a document the public can see in the front end or not. If a student appeals to DPI, the state, which is when the state might get involved, the DPI requires the school district, they have the burden of production. They have to come forward with a record showing they indeed made their capacity analysis in January based on their staffing and how that was done with the numbers. And they also have to come forward with the student, particular student's IEP, and explain based on that IEP why that student couldn't fit in their school. They have to explain it. The students here didn't appeal to DPI, so we don't have that kind of analysis here in the state proceeding, but I do want to point out one student did appeal, SB, which opposing counsel referred to, and DPI, the state, reversed. So exactly what we're supposed to do here is that they said you cannot deny SB a spot. Let's assume SB has a disability. It doesn't matter because SB no longer needed special education services. You have to give SB a spot. That's, I think that cuts directly against their view that this is somehow a disability law. Another example I want to make sure I hit on is their hypothetical on page 14 of their reply brief, and I think it was sort of alluded to in the first argument. If a student, and I'll just try to paraphrase it, if a student has a vision problem and an IEP and must sit in the front row and receive certain written materials, a school district could say no to that student even if they had space in that grade level. No, they can't. They must accept that student. If they have space in that grade level. The only way they could say no to a student like that is if that student also needed special education and they also didn't have space in that special education program or service. And in fact, the student's example on page 14 probably wouldn't even have an IEP. You might have something else called a section 504 plan, which doesn't come into play at all in these cases. So put differently, there are students with disabilities, that student maybe, a student in a wheelchair, who don't come into play in this section that they're challenging at all. A student, say, in a wheelchair, who has no cognitive impairments, who can learn like any other student, doesn't need special instruction, there's no special education capacity analysis to do. It's just that student gets a regular education space. So it only applies to a subset of kids with disabilities and those kids are the ones that have IEPs and it only prevents them from transferring when that IEP describes a service that that school does not have room for. Right. And the IEP determination is obviously made by the resident school district and pre-exists the application. That is the standard procedure, Your Honor. Yes. And the resident school district remains financially responsible for educating the child because they have to pay the receiving school district a difference under a formula and within limits, et cetera. Yes, Your Honor. It's complicated, but to a certain extent, they do transfer some money to what's called a non-resident school to compensate for the difference. Counsel, what would a fundamental alteration be? When does it become fundamental? Is it fundamental if you're hiring an additional speech therapist? Is that fundamental or is it only fundamental if the change is to the physical structure, like we would need to expand our capacity and build another kindergarten classroom to satisfy the space requirements and the needs? When does it become fundamental? I think that would depend. I think the way your hypotheticals pose would turn on a particular school or district's circumstances. So it could be a new classroom to that district is a fundamental alteration. I don't speak for any particular district. We don't run any particular district. In terms of the law, this open enrollment law, which is what's being challenged vis-a-vis the state, we think it has to be a fundamental alteration to wipe out part of the law, which is really what they're asking of the state, saying, we want you to just delete part of that law that takes capacity into account when there's special education needs. So it's kind of a weird fundamental alteration scenario. And we think, at least, the reason it's weird is because this isn't an ADA discrimination claim for reasons I think the court pointed out. Taking a step back from the elements, ADA discrimination claims are about making assumptions based on disabilities, acting on stereotypes about disabilities, those kinds of things over and over in the cases in this court and in the Supreme Court. And that's just not what this law does. It doesn't make assumptions. It's based on what that student needs based on their services. And so when you start looking at each element, it starts to kind of crumble because it's just not an ADA discrimination claim. Make sure I had, I think I addressed your question, Your Honor, about special ed and the January determination. There's no restriction on a student with disabilities applying to a district, even if they've made a determination they don't have capacity, because then they can review the IEP and see if it really is something they can handle. Isn't that the way it works? That's right. That's right, Your Honor. Is that what Judge Connolly meant when he said we have to take a nuanced approach to it? That's right. And the law requires it. And to be clear, there's lingo, the IEPs, that is an individualized education program, so built into it. And there's a whole chapter in the statutes about those and in federal law. It's really, really individual. It's a team that knows that student, parents, teachers, special ed. They get together and it's a very detailed document about what that student needs. And it's service by service. It's not just the student needs special ed, it's the student needs, it gets very detailed, 20 minutes, two times a week for speech therapy, an hour, five times a week for X, because if the student has autism, maybe they need to be taken out an hour every day or all day. One of the students needs to be taken out of classes all day for one-on-one or a small group instruction. We do these plans all the time. So it really is individualized. And the law itself, Wisconsin's Open Enrollment Law, says in the statute that's at issue, it refers to those IEPs and the statutory subsection that creates them. So it is about the IEPs. It isn't about disabilities. So just to be absolutely clear, it is not permissible the way the Wisconsin law works for a school district to say, we're not going to even look at the IEP because we've made a decision in January that we can't accommodate any special needs students. That's right. Okay. And they're really not supposed to be making that determination in January in that sort of broad sense to begin with. So if someone were to challenge them and they came forward to DPI with that kind of just vague assertion, then they would already be in trouble, just in that step-by-step line. And I think the other point I wanted to point out, and I think the court already hit on it, is that most of the time students with IEPs do actually transfer under the law. About 64% of the time is the last data we have. It's only about 7% less than students without IEPs. And you can see that there's some difference because, indeed, students with IEPs have different capacity needs. So sometimes there's not going to be quite enough room. But usually they are able to transfer. And then no one is always able to transfer. And if there aren't further questions, Your Honors, I'll sit down and let the other defendants have some time. Thank you. Mr. Wohl. May it please the Court? I wanted to touch just briefly on- Which district are you here for? That was going to be my sentence. On why Moschigo, Norway, and Paris J1, on their role in the case and why it's really sort of an insignificant role. That was my set piece. I just wanted to touch briefly on some of the issues that have been discussed regarding whether it's seats, whether it's capacity. The main thing I wanted to point out is that the hypothetical situation, and it came up at the district court level too, of somebody who needs just minimal help, but, oh, shucks, we said in January that there's no seats available and you're out of luck. That hypothetical is not what we have with Moschigo and Paris. In those situations, both of them would have had to hire additional teachers, additional staffing to implement the IEP. So it's nothing, the facts of our case are not that it was just a minimal tweak that could have been done. And if that is the case, in the general situation, the law is that the district has to look at the IEP. That's required, to look at the IEP and make a determination, do we have the space, do we have the capacity to be able to implement that IEP? So you can't say we already, and I sort of take umbrage at the way it's phrased, that the districts just say no special ed, no special ed. It is more nuanced and they look at their staffing, they look at who's there, do we have severe needs kids that these teachers have to deal with, and they look at that and they make a determination. But then you have to do the post, the ex-post analysis. You have to look at that and say, do we have capacity to implement this IEP? And both Moschigo-Norway and Paris-J1 in this case did that and determined that they didn't have that capacity. They didn't have the program. For one it was the collaborative kindergarten class that was going to require also an additional teacher. For the other it was some pretty severe, programs required for the severe autism. So they both made that determination and that would have required additional staff also. Made that determination. Now it's not, say that was wrong. Say that they looked at that and they didn't do it carefully. I think it's very important to keep in mind that the students have appeal rights. So if they challenge either January determination as to how much capacity you have or the ex-post determination as to do we have space to implement this student's IEP, that can be appealed to DPI. And the requirement is if the determination was unreasonable, it gets reversed. And that's what happened with Shorewood, I believe. And it happens all the time that that gets reversed. So there is something sort of holding the district's feet to the fire. They can't just willy-nilly say we don't want special ed kids and we don't have space. They get called on that. If that's not right, if that's not supportable, that gets reversed. So it's not a fundamental flaw in the open enrollment process. And in this case, just going back to Moschigo-Norway and Paris and our role here, looking at the complaint, what are the plaintiffs asking for? It's a declaration that the statute section violates the ADA. They want an injunction that these districts can't implement that statute. And they want damages. So we've talked about the declaration about the statute. And we would agree with the state. They're not really arguing, the plaintiffs aren't arguing that any of the districts have again, that could be appealed. So I think that really doesn't implicate us. The injunction, I was sort of shocked to look at. They're not asking to be admitted into the school. They just don't want the districts to apply it in the future. Well, if somebody is going to declare that the statute violates the ADA, no district can apply it. So that's not really unique to us. Right. They want a permanent injunction against the operation of this program. Correct. I think that would be for everybody. And as for damages, I think the plaintiffs got it wrong. I think the district court correctly pointed out that this is an issue of first impression. So to say that these districts met the deliberate indifference standard, that they knew that there was a strong likelihood that following the law was going to violate the ADA. I think that just hasn't been made. And in the briefs, what the plaintiffs do is they take bits and pieces of that. Well, you knew that there was an ADA. And you knew that your decision would have the effect of denying them enrollment. That argument is particularly hard to make in light of the obligations of the IDEA. School districts are kind of put between a rock and a hard place in implementing this mosaic of anti-discrimination laws and laws that impose positive obligations to serve the specific educational needs of disabled students. Yes, Your Honor. So by complying with one, if that puts you in conflict with another, that can hardly be deliberate indifference. I agree, Your Honor. And on that note, what the districts are trying to do in not accepting students of any kind when they don't have capacity is to make sure they can do a good job for the students that they are educating. Thank you. Thank you. Mr. Pollard. Good morning, Your Honors. May it please the court. My name is Kevin Pollard. I represent the Shorewood School District. The Shorewood School District joins in the arguments of counsel for the co-defendants with respect to the facial challenge of Wisconsin Open Enrollment Statute. However, the facts and claims made by the appellants SB and NB against the Shorewood School District are unique from a factual standpoint. And I just wanted to address today the fact that there truly is no case or controversy for this court or any other court to adjudicate involving the Shorewood School District. It's been touched on briefly, but when SB applied for open enrollment at the Shorewood School District in 2014, his mother falsely indicated at that time that he was not in need of any special education services on that basis. So the Shorewood School District believed he did not have any IEP or special education needs. He was enrolled. Subsequently, it was learned by the district that at his prior district in Milwaukee, his he did have an IEP in place. And on that basis, the Shorewood School District then determined that it did not have space available under the open enrollment. Because of the services you required? Because he had an IEP and hadn't disclosed it? He didn't have the IEP at the time, and DPI subsequently ordered Shorewood to take him. That's correct, Your Honor. The district mistakenly believed that the IEP was still in place, and it did not have the capacity to provide the services needed. Well, in fact, the district was told that the IEP was still in place because it was forwarded from Milwaukee. Correct. Right. So it was Milwaukee's mistake. It wasn't Shorewood's mistake. That is correct. And unbeknownst to the Shorewood District, after the application was accepted, SB's mother withdrew the consent for special education. And so the matter was the student was expelled. The matter was appealed to DPI. DPI says, Wisconsin Department of Public Instruction says, the student does not need special education services, is not eligible for special education. You have to let this kid come back. And so they overruled the expulsion. Since that time, there's allegedly a factual dispute about whether or not the district adequately communicated to the student that he was entitled to re-enroll. But there's nothing in the record to show that the district has ever refused to comply with the DPI's order. Well, multiple times during this litigation, the district has made clear, this student can enroll if he wants to enroll. So we're talking about a student who does not need special education services, and the district is willing to accept the student. Not to mention, the record indicates that the student now resides in Shorewood. So he's actually a resident student in the Shorewood School District. So there's truly no— Is that a case or controversy problem? Or is that just a, hey, we were entitled to summary judgment problem? Because if he was denied, I mean, we might have a dispute about the facts, or we might not, which would be summary judgment question. But if he's saying, I was denied because my IEP wasn't in place anymore, and you wrongly denied me, and you didn't communicate to me that my expulsion was revoked. Then he suffered an injury seeking compensatory damages for it. And maybe he's not entitled to that because there's no dispute of material fact about whether, in fact, the facts as you described them were true. But that's not a mootness problem. That's just a, hey, you're not entitled to relief. The claim for the injunction is certainly moot, I would argue. The claim for damages, perhaps, is not moot. Although there's been no plausible damages alleged in this case. But again, that's a reason for maybe you to be entitled to summary judgment. It's a merits determination in your favor. That's fair. I'm not going to argue with you on that. But I mean, I do think that the plaintiff has an obligation to plead a plausible case for damages in order for there to be subject matter jurisdiction. And I don't think there is because he's entitled to a free and appropriate education in his resident district. So there could be no damages. So that's all I have to say. Thank you for your time today. Thank you. Mr. McGrath, rebuttal. Thank you. I want to address a couple of questions that your honors asked our opponents. And I think both Judge Barrett and Judge Durkan asked similar questions, which is, can't you fix all this when you do the individual reviews of the applications after January and after February? And I think Attorney for the State, Attorney Rusamato said that you can. But the law says that you can't. Once Muskego and Norway made the decision in January that we will not accept applications from any students with IEPs, with disabilities, under Wisconsin law, they cannot go back and admit students with disabilities that require any special education services of any kind. That's the Wisconsin Administrative Code that I cited earlier, which is... But counsel, the state said, in this clarification I've been seeking about, are we talking about seats or are we talking about capacity to provide services? That it's not saying we're not going to take any students with an IEP or any students who need services. It's saying when we process applications, we will do so knowing that we only have four hours worth of speech therapy services that we can dole out. And you're saying that that's just not true? It's not true. And certainly there's no evidence in the record that when Muskego and Norway said we'll take no children with disabilities, that they said unless they only require one hour of speech therapy, there's no indication that Shorewood made such a determination. There's no evidence in the record that Paris made such a determination. What they say is 50 seats for children without disabilities, zero seats for children with disabilities, under the Wisconsin law and regulation. They cannot undo that because then they'd be playing favorites, like Attorney Russomano said, that they couldn't. So he and I strongly disagree about that. And we've cited the Wisconsin Administrative Code provision on it. One question you asked Judge Sykes is, are they bound by the IEP from the resident school district? And the answer to that is they're actually not. Once they enroll the child and accept them as they should, then they become responsible to do the IEP. Right, but in determining admission, the admission decision is based on the IEP, which is supposed to be automatically sent by the resident school district. That, in fact, is true. And there is a legal obligation on the part of the non-resident district when reviewing an application to take a look at the IEP. Absolutely. I was just pointing out that... So they can't just ignore that and say we don't have any... But they do have the right to do a new one once they accept the student. Oh, certainly. So the last point I wanted to make here on the merits is that every child, every student in the state of Wisconsin is entitled to a free appropriate public education in their residence district, whether they're disabled or non-disabled. What Wisconsin has done is said, we're going to give an extra benefit to students without disabilities and allow them to participate in an additional excess capacity program called open enrollment, but they don't make it available in the same way to children without disabilities. Sure they do. They make it available to students with IEPs and students in regular education on the same terms based on capacity to serve the needs of the student. Moschigo, Norway made it available to 50 students without disabilities and zero students with. And in that year... Based on existing capacity. We know from the record that over a thousand kids with disabilities were denied under section 5A4 of the open enrollment law, which only applies to students with disabilities. So in one year, 1,000 children, over 1,000 children with disabilities were denied the ability to participate in this program because they have disabilities. I see my red light is up. Thank you. Our thanks to all counsel. The case is taken under advisement.